421-0490-WC Danville Mass Transit Appellant by Lilia Picazzo v. Illinois Workers' Compensation Comm'n Jean Bates Martin Appellee by Gary Stokes. Council Picazzo, you may proceed. Good morning, Honorable Justices. May it please the Court. Could you speak up or turn up the volume on your speaker? Yes. Sure. Is this better? No. No? Okay. Let me move this a little bit closer. Yeah, maybe get closer to the microphone. Okay. How does this sound? That's helping. Okay. Thanks so much. I'll begin again. Good morning, Honorable Justices. May it please the Court, Council. My name is Lilia Picazzo and I represent the Appellant Danville Mass Transit in this matter. As a quick procedural background, the matter involves a June 15 of 2016 incident. The case was tried and arbitrated. And though other body parts were involved in this case, my argument focuses on the cervical condition only. As you know, the arbitrator found Ms. Bates Martin's cervical condition was causally related to the work accident, awarded TTD benefits through December 5 of 2018, prospective medical care, and past medical services. The matter was taken on review and the Commission modified the award to include a repeat injection, but otherwise affirmed and adopted the decision. The Circuit Court included additional TTD benefits through the trial date, as well as finding that Ms. Bates Martin had not yet reached MMI. We are asking this Honorable Court to reverse the decision of the Commission as it relates to the cervical condition, and thus reversing and denying TTD benefits, the prospective medical care, and the past medical services, as the decision was against the manifest weight of the evidence. So this is a case in which it involves an alleged pre-existing condition that was said to be aggravated or accelerated by the work accident, correct? Correct. I mean, there's no dispute that she suffered from a pre-existing cervical condition, right? No, there's no dispute regarding that. All right. So is the loss well settled that a work accident that aggravates or accelerates a pre-existing condition is still compensable? It can still be compensable. The issue here, though, is whether her cervical condition as of the date of trial, though, was still causally related to that initial work accident. Okay. And what evidence was there that it was not? Sure. Just to go back, and as you know, it's a June 15, 2016 accident. She was working as a city bus driver for the appellant at the time during a pre-ride inspection. She slipped and had her left arm outstretched while holding onto a rail. As she fell, she let go of the rail and fell down. When she got back up, she continued her bus route eventually, did complain of left arm pain, and went to medical treatment that date. And again, we're not disputing that she did not complain of any neck pain or that there was some sort of aggravation of a pre-existing condition. But if we look at the record, initially from June of 2016 to August of 2016, she was seen by a PA, Steven Jacobs. She initially denied neck pain on that date and complained of left shoulder pain. Her diagnosis, again, had nothing to do with neck injury at the time. A few weeks later, yes, she did complain of the neck pain, but the medical records indicate that she still continued to exhibit full range of motion. There was no radiation in her symptoms as it relates to the neck. There was no tingling and no tenderness. Even on July 6th, a few weeks after that, her pain was noted to be vastly improved. And at that point, she hadn't even had any additional aggressive medical treatment as it relates to the neck condition only. On July 21st, there were no noted neck issues, and her symptoms were noted to be mostly soft in nature. She again exhibited excellent range of motion and without any kind of ridiculous symptoms. So who's Dr. Ross? Who's Dr. who, I'm sorry? Who's Dr. Ross? Dr. Ross was one of the IME doctors. Okay, and he gave a causal connection opinion, correct? He did give a causal connection opinion, yes. And Dr. Singh was your IME? Correct. And he even acknowledged his deposition of the underlying disc degeneration of Klaman's cervical spine was aggravated by the Klaman's fall, correct? Correct. Okay. And again, I was asymptomatic before this accident. That's not disputed, is it? Not necessarily disputed because there were no medical records entered into evidence. I do not know that. So no, not disputed. All right. Sure. And again, I point to, yes, there was the opinion of Dr. Ross. And yes, we do have Dr. Singh who found that she did aggravate her cervical condition. But again, we have to look at the records where initially she was vastly improving. It was noted to be soft tissue in nature. There's a phone call in the record from July 25th where she called the provider and stated that she developed pain in the back of her head and her neck on July 22nd, and that that pain was worse than the pain from the fall. And now that's about a month and a week after the fall incident at work. So again, we're not saying that she didn't aggravate her condition. However, it looks to be that she worsened it at some point about a month after the fall. And there's also doctors that are indicating that her symptoms were soft tissue in nature. Her examinations initially for about two months were almost normal, again, as it relates to that neck condition. So you're saying somehow it worsened, but you don't know how it worsened or what. Are you suggesting she was a malinger, or what are you suggesting? No, not suggesting anything. I wish I could say that there was something more concrete. It's just in the record that she contacted the provider from Carl Clinic and noted that there were worsening symptoms to her head and her neck from, I believe it was a Saturday, so it would have been July 22nd, is what was noted in that record. She was even offered an additional medical appointment for her complaints. She rejected setting an appointment because she had one later in the day, I believe, or with a different provider. But it was noted that her symptoms were newer, at least those worsening symptoms were newer symptoms. Well, sometimes in the recovery process, I mean, it isn't really necessarily a straight line. Does it have to be? I mean, sometimes you think the symptoms can wax and wane. Could they not? Sure, that is correct. They can wax and wane. But again, what we're looking at is initial medical records that were stating that her symptoms were soft tissue. And up until that point, her range of motion in her neck was noted to be excellent. She was noted to be vastly improving. And this was just with physical therapy treatments. But even setting that aside, the commission does ignore that she did not start complaining of the worsening symptoms until later in July of 2016. And the commission ignores that by August of 2016, that's when she started complaining of the radiating and worsening pain. And there's no dispute that she began undergoing additional medical treatment for the neck. So assuming for the sake of the argument, there is quote unquote, conflicting medical evidence testimony. How does that require us to find an opposite conclusion to the one drawn by the commission is clearly apparent? Well, again, I think it's not necessarily that, again, there's no dispute that she did not There's no dispute that it could have been an aggravation. But again, what the commission failed to see is whether her condition as of the trial date was still causally connected to that initial injury. There were multiple record medical reports within the record that show that she was vastly improving before she even started complaining of worsening symptoms. There were doctors that referred her for EMG examinations because of the worsening radiculopathy, which is what he believed that she had. The commission in their own decision found that they didn't give any weight to him on a completely different body part because of his inconsistent opinions in his own reports, as well as in his testimony, yet they gave him weight as far as this condition. Is it our province to reweigh the evidence? You seem to be leading us an invitation to reweigh the evidence here. No, not at all. Again, I'm just stating that it was against the manifest weight of the evidence because they didn't look at the record in its entirety. Just even pivoting over to their decision, they did indicate that based on the credible evidence, but the commission doesn't indicate what was the credible evidence that they relied upon. They note the negative EMG. They note that her symptoms were improving in the beginning of, yes, they do rely on Dr. Singh indicating that she had aggravated a condition, but again, the question was whether as of the date of the trial, her condition was still related to that initial injury. For multiple months before she started complaining, she was vastly improving. There were no injections at the time or whatsoever. Even if we look at an application for adjustment of claim that was included in the record, it was filed in August of 2016, two months after her injury, and at that time, she indicated that she only had injury to her left arm and her shoulder. It was modified or blended at the trial date, and while we don't dispute that she has any ability to do so, she certainly can, it also goes to show that at least in her mind, I don't believe that she thought that she had a neck injury at the time. It lines up with the fact that the medical records from PA Steven Jacobs were noting that it was soft tissue in nature. She had multiple doctors who also felt that her symptoms were relating more to a left shoulder that, again, is not at issue here rather than the neck, even though that they were offering her injections or MRIs or anything. Again, there were two providers initially in and that would have been Dr. Tipernany and Dr. Ahmad. Dr. Ahmad gave her an injection at the recommendation of Dr. Tipernany, and when he even evaluated her on his own, he felt that the symptoms were more related to the left shoulder, spoke to her about that, and then injected the left shoulder. She then went back to Dr. Tipernany and was reporting improved symptoms, but the doctor even noted that it was a placebo effect because it wasn't an injection into the neck area, which was what was originally recommended, and again, it's because the second doctor who viewed her to inject her believed that it was a left shoulder or her symptoms were emanating from the left shoulder rather than the neck. And then again, I would also like to go back to, you had mentioned Dr. Ross. Dr. Ross was an IME provider who had seen Ms. Bates-Martin in March of 2017. He's unconnected with this case. He was not her treating physician, was he? No, he was not her treating physician whatsoever, no. Dr. Ross evaluated her for the shoulder and the neck, and again, I'm only focusing on the neck here. He's the one that recommended that she possibly, because of her symptoms, undergo the EMG and undergo an additional injection. The EMG that he recommended was performed about a few months later. The EMG was negative, yet he still continued to opine that her symptoms were related to the neck, but when we look at his report and even his own testimony, he does indicate that it's clear she had a direct injury to her shoulder, and the question continued to be whether her symptoms were originating from the neck or not. He stated in the report that it was difficult to ascertain whether a component of her residual pain was coming from the cervical radiculopathy, and that EMG shows that it was negative for radiculopathy. So again, we believe that the commission's decision was against the manifest weight of the evidence, because there were multiple doctors, again, and objective exams and diagnostic reports that indicate that her symptoms were negative for that radiculopathy. Again, there's no dispute that she might have been complaining of ongoing neck pain or that she possibly aggravated that condition, but that condition would have only been temporary because the records are showing that she was vastly improving even just one month or two to three weeks after that initial incident, and again, her own application shows that she believed she had a shoulder arm injury, and it wasn't until the date of trial that it was amended after the doctors were going back and forth and did not even know between themselves what her pain symptoms were coming from, and again, we're not disputing a shoulder, and that's not at issue here. It's just the neck, and the commission, although they know all of these negative findings and opinions of doctors noting that she was improving, they just ignore that and look to the fact that she must have aggravated a condition, and because she aggravated, that must have meant that three, two and a half years down the line, that condition was still related when her symptoms, again, were inconsistent with those objective findings from the doctors. By the time that Dr. Singh had seen her, just fast forward to May of 2018, he noted that her symptoms were inconsistent with those at least specifically for the neck area. He believed that she was at MMI at that point and that she could return to work without restrictions. I apologize for one second. And again, just one more time, we're not disputing Ms. Bates-Martin was complaining of the neck pain a few weeks after her fall, but the commission decision was inconsistent with that medical evidence, even giving her the benefit of the doubt that she aggravated a prior neck condition. The aggravation, again, was temporary in nature. The condition doesn't correlate with unchanged MRIs. A negative MRI or negative EMG, I'm sorry, that was recommended by one of the IME doctors, it doesn't correlate with the denial of radiating pain for two months. The ability to move her neck during those examinations or that there were no issues with her neck or cervical spine, even as early as July of 2016. It also doesn't correlate with a phone call that's noted in the record from later on in July of 2016, where she called and complained of worsening pain to her neck and her head. And again, we don't know what it was that was worsening it. All we I'm not going to say that she was malingering. I'm not going to say that there was some other kind of incident, because again, we don't have that information. All we know, again, is from the record that she was offered an appointment for those symptoms. She declined that appointment, and it was noted that those symptoms were newer symptoms, yet she's still counsel. Your red light has come on. Your time is up. You will have time and reply. Okay. Thank you. Counsel Stokes, you may respond. Thank you, Justice Holdridge. My name is Gary Stokes. May it please the court, counsel. I represent the defendant in this matter, Jean Bates Martin. A couple of things off the bat to correct regarding counsel's argument. Justice Hudson, you mentioned asked her at one point, so Dr. Singh was your IME. The fact is all three IMEs were their IMEs. They hired Dr. Mizzamore, a board-certified orthopedic surgeon, who said that it was related. They hired Dr. Ross, board-certified neurosurgeon, who said it's related. And Dr. Singh, it was their third IME. So when you see IME in the record, understand they were all for Dr. Ross's deposition, but he's their IME, and he's not treated her in any way, shape, or form. He's made recommendations. He's indicated that he needs certain tests. This EMG business, he explained the EMG. He said the EMGs can be negative, and the problem can still be sourced in the cervical spine. And the way to find out is to have an injection in that I'm not sure what his name was, who actually performed that injection, but unfortunately, they didn't monitor it in the days immediately following. So that's why Dr. Ross said we need a second one, and that's what the commission order was for additional medical treatment. It's really diagnostic in nature to find out for sure, is this disc the source disc or not? Dr. Ross has already indicated he believes it is. So there's really only one issue in this case. The issue is, is the decision of the Illinois Workers' Compensation Commission that the neck problems were in fact caused, aggravated by the trauma that she sustained on June 15, 2016. That's really the only issue. I think you're probably correct on it, but how do you respond, Mr. Stokes, to Ms. Picasso's argument, alleging that the objective medical evidence is contrary to what her testimony was? It's contrary to what? Whose testimony? The claimant's. Yeah, it's not consistent. It's absolutely not inconsistent. She was consistent throughout. And the IME doctors, and Dr. Ross in particular, noted all of those things. All of the things that counsel has referenced came before Dr. Ross's IME and before Dr. Ross gave his testimony and gave his opinions. He included all of that in his opinion. As you said, and you hit the nail on the head, symptoms wax and wane. They aren't consistent in a straight line from day one to day of treatment. And by the way, she hasn't had treatment. That's what we've been fighting for for two and a half years, that she's not getting treatment for the neck. But in every instance in which counsel has referenced, and particularly in the reply brief, of treating physicians suggesting that there's no problem in the neck, I can go to every single one and tell you why that's not true. I mean, the example in the reply brief, they talk about Dr. Tepernini saying, well, in her interpretation of the MRI saying, well, this shows that there's no acute injury to the spine, to the neck, to the cervical area. In the very next line, she diagnoses a cervical strain and cervical radiculopathy. Dr. Tepernini believed there was an injury to the neck. The doctor who performed the injection, Dr. Abood, whatever it was, the respondent suggests that he felt the problem was not sourced in the neck, it was in the shoulder. If you look at the very note that they cite, the very note, he says it's appropriate for her to have cervical physical therapy at this point. Well, why have cervical physical therapy if you don't have a cervical problem? And he said, if you don't see significant improvement from this injection in the shoulder, come back and we'll do it in the neck. No doctor's going to provide an injection into the neck if he doesn't believe there's a problem there. Every single instance in which we cherry pick and pull out something out of context to suggest or imply that a doctor doesn't believe that the neck is wrong. And the context in all of these instances shows that they all believe that her neck was involved. The question, the commission question of, you know, is this against the manifest way of the evidence? Here's, I would flip this on its head and ask you, here's the situation. Here's what you must believe if you believe that the commission decision is wrong. You must believe that it is utter coincidence, total coincidence that a 55 year old woman who's never had one single complaint or problem or treatment or anything else relative to the left cervical neck and upper extremity sustains an injury on June 15th, 2016 to her left side, a trauma so severe that it tears her labrum. It tears her biceps tendon. And according to the MRI tore the rotator cuff supraspinatus. And it's within days after that, days after that, she's complaining of these neck problems. You have to believe that's total coincidence. Total. The commission obviously didn't believe that. The commission did not believe that's and for good reason. Obviously it's not coincidental. You have to, not only do you have to believe that that's totally coincidental, you have to discount the opinion of Dr. Mizzamore board certified orthopedic surgeon hired by respondent because his report says it's clearly aggravated the preexisting cervical degenerative disc disease. You have to discount the opinion of Dr. Ross, who by the way, also testified under oath that that's the case. Again, respondents IME that this was related and you have to essentially disagree. Not only do you have to say that their opinions were wrong, you have to conclude that their opinions were so wrong that no reasonable fact finder could find them persuasive. That's the standard of review. No reasonable fact finder could find that to be conclusive. And by the way, Dr. Singh, who is the, they had to go to a third IME to get the opinion that they wanted. Dr. Singh, the basis of his opinion that the C3-4 and C4-5 discs are not involved here is he said, I didn't say this. He put it in his report. His words, if those discs were involved, you would find the complaints to be in the trapezius, not down the arm. I documented 13 different occasions in this medical record, which is extensive. I grant you that 13 different situations where there were complaints, recorded complaints by the medical providers of symptoms, pain in the left trapezius. In other words, Dr. Singh's opinion has no basis. It's illegitimate. And we're balancing that against the opinions of Dr. Missimore and Dr. Ross and no treating physician saying otherwise. The, and I, as I said, I can go through each one of the instances brought up by counsel in the reply brief relative to the treating physicians. But one other thing I want to make a note of on this application business, the original application that does just list the left arm and shoulder was filed 49 days after the accident. What had not happened by that point, she had not even seen a doctor by that point. A PA was the only person she had seen to that point. And we had a, we had a shoulder MRI that showed a torn labrum, a torn supraspinatus tendon, and a torn biceps tendon. That's what the knowledge we had 49 days after the incident to file the application. Now, counsel puts in their brief, respondent put in their brief, and again, said today that we amended that application on at trial. We did amend that application at trial under the instruction of the arbitrator, because the arbitrator, we had our second filing was a year before that. 2018, we filed an application specifically for the neck, because after the original application, we had an MRI of the cervical spine, which found these problems. And that's why the second application was filed. Yes, the first application was amended because arbitrator Puglia decided she didn't want two applications. They were the same date of accident. We should just simply amend the first one and dismiss the second one. When you're a trial, the arbitrator says, do something like that. We do it. I believe it ends up at the same conclusion, same result. We've got these body parts mentioned. The fact of the matter is, in my opinion, this is not close. The commission has weighed all of this evidence and included consideration of these things, which counsel claims are inconsistencies, and concluded that this a unanimous decision, by the way. In other words, the employer representative agrees. All four people who've heard this have said, this is clearly related. And that's been the decision of the commission. Now, I want to respond very quickly on the reply brief on this business of if you find in favor of the commission on this and affirm this, it seems like the in the argument or in the reply brief is that, yeah, but you can still discount the medical awarded and the TTD because she wasn't being treated at that point. In other words, it's her fault. She wasn't being treated. She could have gotten treatment. And it doesn't appear that she was being treated by the time we got to arbitration. Two points to be made on that. Number one, I went back and looked at the argument. You know, our continuing legal education, I'm going to give someone some credit here. Justice Holdridge, I have watched more than one of your presentations to the ISBA. And I watched a recent one from February of 2021. And I'm reminded of that movie, Patton, when George C. Scott is playing Patton, and he's got his field glasses out there. And he's watching Rommel in the tank formations out there. And he says, I read your book, you magnificent so and so. Well, Justice Holdridge, I read your materials, and I listened to your presentation. And you talk on 341.87. And you read the language from the rule, points not argued are forfeited and shall not be raised in the reply brief in oral argument or in a petition for rehearing your statement on that right below it, where an issue is merely included in a vague allegation of error, it is not argued and it will not satisfy the requirements of rule 341. I went back again and read the respondents statement on the point two on the TTD, the medical and whatnot. And I cannot read that without any with any conclusion other than the only reference defense here is causal connection. But I will respond on one point on this business of well, she wasn't being treated. So it's her fault. They cut her off in May of 2018. After they got their third IME opinion. After they got the opinion that they felt they and then they complain because she's not getting medical treatment. And their argument is, well, you can go get group, your husband has group insurance, you could do it because we know in the record, you testify that you got a MRI on under your husband's group. Not only did they cut you off of medical, and now you have to go to group understand group is not workers compensation. You have to pay co pays, you have to pay deductibles, you have to get permission from your group for referrals from this, that and the other. And oh, by the way, you didn't just cut her off of medical in May of 2018. You cut her off of TTD. She's had no income, none for six or seven months before arbitration. And the complaint as well, you didn't get treatment. As I said, I don't think this is a legitimate argument, because it's not raised in the in the argument portion of their brief. But if it is, and the court considers it, those facts ought to be taken into account. I'd be happy to answer any questions for any of the justices regarding any particular the treating. I do have a question, Mr. Stokes. I don't know if you're meaning to apply the justice holdage reminds you of General Patton. But I will tell you that at times as our presiding justice, he does put the binoculars on us to as well. Just just be aware of that. Okay. I've noted that. Thank you. Any other questions from the court? I don't believe there are. Thank you, counsel. Council, you may reply. Sure. Before I go into any final points, I do want to go to the report of Dr. Miss more. Yes, we're three IMEs. But Dr. Miss more is a specialist for the shoulder, not the neck. So he had no he could have given an opinion regarding the neck. But he also himself noted that there were conflicting opinions between the doctors as to whether the complaints were coming from the neck, or even the shoulder. And then later on in his report, he states that I find that the exam today to be inconclusive, and gives further recommendations for the shoulder at that time. So it's not that we're going to different doctors to sit here and find one that's going to give the opinions. Because even going to Dr. Ross, the EMG was authorized, she had the EMG, she had an injection, the EMG was negative for this individual. And again, there's no argument that she could have been waxing and waning. There's no argument that she could have aggravated a pre existing condition. It's just that if she was vastly improving in the initial months, there's doctors that can't figure out where her symptoms are coming from. Now it just seems like they're trying to give treatment just to try and throw, you know, something into the air to figure out where her complaints are coming from. But again, if we look at Dr. Singh's report, and even in his testimony, the symptoms are inconsistent with that EMG that was recommended by Dr. Ross, it was negative for cervical radiculopathy. Even in his report, he starts talking about carpal tunnel that wasn't even at issue here. And possibly that's where her symptoms could have been coming from. Yes, she did continue to treat. But again, Dr. Singh's report notes that despite an aggravation of a pre existing neck condition, she did not have symptoms as of the date of his examination in May of 2018. It was inconsistent with the reports of the EMG. To touch on the EMG that Dr. Ross indicated, were instances of it being negative. Dr. Singh in his testimony stated that it's more likely that that kind of examination would produce a false positive because of how sensitive those type of examinations are. The fact here is that that examination was negative for C4 radiculopathy. Yes, there were positive findings, but those failed to recognize that there were multiple instances of vast improvement in her conditions, even before she had any injections, about a month into the fall that she had, before she even got to the additional doctors when a shoulder specialist noted that it's inconclusive. Let's see what else this pain is coming from. We have Dr. Singh who evaluated her in May of 2018. Again, noting that negative EMG, that Dr. Ross even noted the negative EMG himself, but still stated, well, she must still have these symptoms because of the complaints that she was making. For those reasons, we're asking this honorable court to reverse the decision of the commission as it relates to the cervical spine. Therefore, because of that, also deny the TTD, the prospective medical care, and the past medical services that she had. At this point, I would welcome any further questions that you might have. Any questions from the court? I don't believe we have any. Thank you, counsel, both for your arguments on this matter this morning. It will be taken under advisement and a written disposition shall issue.